# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| COUVILLION GROUP, LLC., <br><br> *Plaintiff,* <br><br> v. <br><br> WHITE MARLIN OPERATING COMPANY LLC; AGUA TRANQUILLO MIDSTREAM LLC; TALCO PETROLEUM LLC; TORRENT OIL, LLC; & NIGEL SOLIDA, <br><br> *Defendants.* | Civil Action No. 4:22:cv-00908 |

## WHITE MARLIN OPERATING COMPANY LLC'S COUNTERCLAIMS AGAINST COUVILLION GROUP, LLC

White Marlin Operating Company LLC ("White Marlin") files these counterclaims against Couvillion Group, LLC ("Couvillion") and would respectfully show as follows:

### I.   SUMMARY OF ACTION

1.   Couvillion contractually agreed to remove 1,260 linear feet of pipeline from the Corpus Christi Ship Channel, and another 511 linear feet of pipeline from the Corpus Christi Intercoastal Waterway over the course of an estimated 14 days in exchange for a lump-sum payment of $509,483.20.

White Marlin's Counterclaims - PAGE 1

Couvillion breached its promise to perform that work, performing only a fraction of the removal work before being fired from the job. Worse still, Couvillion demanded—and received—over $1,000,000 in payments for work that was worth, at most, $300,000. White Marlin also had to hire another company to complete Couvillion's scope of work. Couvillion's breaches have therefore caused White Marlin at least $2.5 million in damages.

## II.   PARTIES

2. Counter-Plaintiff White Marlin is the Defendant in this case originally filed by Couvillion. White Marlin has already appeared.

3. Counter-Defendant Couvillion is the Plaintiff in the case it originally filed.

## III.   VENUE AND JURISDICTION

4. This Court has diversity jurisdiction pursuant to 28 USC Section 1332(e) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because the action is between citizens of different states.

5. Pursuant to 28 U.S.C. § 1391(b), venue is proper because Defendant White Marlin resides in the State of Texas, in this judicial district, and because, by virtue of the mandatory and exclusive forum selection clause contained within the Master Service Agreement between Couvillion

and White Marlin at issue, the parties have consented to venue and jurisdiction in the Southern District of Texas – Houston Division.

## IV. FACTUAL ALLEGATIONS

6. The Corpus Christi Ship Channel is a 45-foot-deep channel that extends from the Gulf of Mexico 34 miles into the Port of Corpus Christi. The Port is the 4th largest US port by tonnage.

7. To accommodate and sustain traffic, the United States Army Corps of Engineers instituted the Corpus Christi Ship Channel Deepening and Widening Project.

8. As part of this process, the Army Corps of Engineers required the owners of the pipelines that traverse the Corpus Christi Ship Channel and the nearby intercoastal waterway to have certain pipelines removed.

9. As part of the Army Corps of Engineers' mandate, Southcross Energy, through its wholly owned subsidiary Aqua Tranquillo Midstream, LLC, was ordered to remove certain portions of a steel pipeline crossing the Channel in the Corpus Christi Bay owned by Aqua Tranquillo.

10. Amongst the removal obligations was a total of 1,771 feet of steel pipe from the Corpus Christi Bay and Intercoastal Waterway, known as the A11 pipeline.

11. In March 2021, Encinal Midstream, LLC, a wholly owned subsidiary of Defendant Talco Petroleum, purchased Aqua Tranquillo.

12. As a part of the Purchase and Sale Agreement, Southcross Energy deposited certain funds in an escrow account to fund the removal operations of certain pipelines, including the A11 pipeline.

13. Aqua Tranquillo then contracted with White Marlin (also a subsidiary of Talco) to manage the removal of the A11 pipeline.

14. Rather than undertake the removal work itself, White Marlin solicited bids from eleven contractors and eventually selected Couvillion, which had provided a lump-sum bid of $509,483.20, to remove 1,260 feet of pipe and cap the ends in the Corpus Christi Channel and remove 511 feet of pipe and cut and cap the ends in the Intercoastal Waterway.

15. On July 23, 2021, White Marlin and Couvillion executed a contract ("the Day Rate Proposal") for Couvillion's work.[1]

16. In that agreement, Couvillion expressly agreed to timely "mobilize personnel and equipment," "rig up pull barge and pulling unit," "set up Mary Jane," "provide pipeline removal" and "demob Couvillion equipment."[2]

---

[1] ECF 11-1 at 2.
[2] *Id.*

17. Couvillion also agreed to timely provide all necessary personnel and equipment, including a 10-man crew, a tug vessel, a 90-foot Excavator, "a deck barge Cherokee" with "pulling unit spread, tools, winch, etc.[,]" a Spud Barge Mary Jane, a Hopper Barge, and a Diamond Wire Saw with six additional DWS loops.[3]

18. On July 26, 2021, the Parties executed a "Master Services Agreement" ("MSA") which further laid out the parties' obligations to one another.[4]

19. In the MSA, Couvillion expressly warranted "that it will perform the Work (i) diligently; (ii) in a thorough, safe, good, and workmanlike manner; and (iii) in a manner that is in full compliance with the Agreement."[5]

20. Couvillion also agreed to timely "supply its own personnel of the type and number necessary to perform" any work agreed upon by the parties[6] and to "at its own expense, furnish all tools, equipment, machines, appliances, parts, material, and supply necessary for the performance of the Work."[7]

---

[3] Id.
[4] ECF 11-2.
[5] Id. at ¶ 9.4.
[6] Id. at ¶ 9.1.
[7] Id. at ¶ 9.2.

21. Finally, Couvillion expressly acknowledged that "[t]ime is of material importance in the completion of any work under the Agreement."[8]

22. Couvillion egregiously breached its obligations under both the Day Rate Proposal and the MSA (together, "the Contracts"). Couvillion originally estimated that it would take 14 days to remove *all* of the steel pipe referenced in the Day Rate Proposal.[9] In reality, it took Couvillion roughly seven weeks to remove *only* 476 feet of steel pipe.

23. Couvillion blames its failure to undertake the work required in a timely fashion on the fact that conditions were not as they were originally represented.

24. While partially true, the change in conditions was not the driving force behind Couvillion's complete failure to satisfy its obligations.

25. Instead, Couvillion did not timely perform under the Contracts because of gross incompetence. Couvillion could not even find the pipe it was supposed to remove, nor did it furnish the equipment it needed—and contractually agreed to provide—to timely perform under the Contracts.

26. White Marlin at first tolerated Couvillion's delays because Couvillion repeatedly assured White Marlin that White Marlin would not

---

[8] *Id.* at ¶ 32.
[9] ECF 11-1 at 2.

be charged for overages caused by Couvillion's own failures to comply with the Contracts. Such representations aligned with the parties' agreements.

27. When Couvillion management learned that its project manager had made these representations to White Marlin, however, Couvillion removed him from the job, and replaced him with a new project manager who reversed course.

28. Couvillion notified White Marlin that it expected to be paid millions of dollars despite its own incompetence, its prior representations, and the parties' agreement.

29. White Marlin fired Couvillion on September 24, 2021.

30. As a result of Couvillion's Breaches of the Contracts, White Marlin had to retain and pay another company to complete Couvillion's scope of work.

31. The funds for the removal work were held in an escrow controlled by Targa Resources, Inc., who had acquired Southcross Energy.

32. Aqua Tranquillo and White Marlin needed the escrow funds to pay the contractor that took over for Couvillion.

33. Targa would only release the escrow funds if Couvillion released all claims it could have against Targa.

34. Sensing an opportunity, Couvillion demanded over $1,000,000 from the escrow funds—nearly two times the amount it promised to perform the entirety of the removal work for White Marlin.

35. Eventually, Targa and White Marlin capitulated to Couvillion's extortion, and agreed to release $1,089,000 (via escrow) for the "work" Couvillion performed in connection with the Contracts even though that work was worth, at most, $341,612.

## V. CAUSES OF ACTION

### COUNT I: Breach of Written Contract

36. White Marlin incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

37. In the Contracts, Couvillion agreed to timely remove 1,260 linear feet of pipeline from the Corpus Christi Ship Channel, and another 511 linear feet of pipeline from the Corpus Christi Intercoastal Waterway in exchange for an estimated lump-sum payment of $509,483.20.[10]

38. Couvillion also agreed to timely provide all necessary personnel and equipment, including but not limited to a 90 foot Excavator, a 10-man crew, a tug vessel, "a deck barge cherokee" with "pulling unit spread, tools, winch, etc.[,]" a Spud Barge Mary Jane, a Hopper Barge, and

---

[10] ECF 11-1 at 2.

a Diamond Wire Saw with six additional DWS loops to accomplish the work.[11]

39. Couvillion breached the Contracts. Couvillion did not timely provide the necessary services, supplies, or equipment and only removed 476 of the required 1,771 linear feet of the pipeline. As a result, White Marlin had to retain another entity to perform the work at a cost of several million dollars.

40. As a result of Couvillion's breaches, White Marlin caused Couvillion to be overpaid by more than $700,000 and White Marlin and incurred charges of $2,500,000 to complete Couvillion's scope of work.

41. All conditions precedent required of White Marlin under the parties' contracts have been performed.

## COUNT II: Unjust Enrichment

42. White Marlin incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

43. Couvillion received a benefit at the detriment of White Marlin. Couvillion was paid $1,089,000 for the work it performed even though the value of that work was, at most, $341,612.

---

[11] *Id.*

44. As a result, Couvillion was unjustly enriched by at least $747,388.

## VI.    ATTORNEYS' FEES

45. Because Couvillion breached the Contracts, White Marlin is entitled to an award of attorneys' fees (capped at $150,000).[12]

## VII.    JURY DEMAND

46. Couvillion requests a trial by jury on all contested issues.

## VIII.    PRAYER

ACCORDINGLY, White Marlin prays that Couvillion be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against Couvillion in favor of White Marlin the following relief:

a) An award of the full amount of actual damages incurred by White Marlin and caused by the acts and omissions of Couvillion;

b) An award of equitable damages, as requested above;

c) Reasonable and necessary attorneys' fees;

d) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

e) Cost of court; and

f) Such other relief, general or special, at law or in equity, to which White Marlin may show itself to be justly entitled.

---

[12] ECF 11-2 at ¶ 26.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: /s/ *Joseph W. Golinkin II*
    Michael Cancienne
    State Bar No. 24055256
    Joseph W. ("Jeb") Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Ste. 2300
    Houston, Texas 77056
    713.955.4028
    713.955.9644 Facsimile
    mcancienne@jlcfirm.com
    jgolinkin@jlcfirm.com

**ATTORNEYS FOR WHITE MARLIN**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on May 25, 2023.

By:  /s/ *Joseph W. Golinkin II*
      Joseph W. Golinkin II